**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TEMPLE OF NOYA, a New York religious
corporation, on its own behalf and on behalf of its
*pasajeros*; MARIA ANN MORGAN, individually
and as founder and lead *maestra* of the Temple of
Noya; DR. ALAN HUTCHINS, individually and
as Chairman of the Temple of Noya; MICHELLE
BENTSMAN; and JONATHAN KATAYAMA,

<em>Plaintiffs</em>,

v.

MERRICK GARLAND, in his official capacity as
Attorney General of the United States;
ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Homeland Security;
ANNE MILGRAM, in her official capacity as
Administrator of the Drug Enforcement
Administration; and TROY A. MILLER, in his
official capacity as Senior Official performing the
duties of the Commissioner for U.S. Customs and
Border Protection,

<em>Defendants</em>.

Civil Action No. 1:24-cv-1195 (AMN/DJS)

**COMPLAINT**

## INTRODUCTION

1.      The United States was founded on the distinctively American promise of religious

liberty. Indeed, the opening clauses of the Bill of Rights are devoted to religious freedom: The

First Amendment begins with the mandate that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I.

2.      In modern times, a near-unanimous Congress reinforced this principle through the

enactment of the Religious Freedom Restoration Act of 1993 ("RFRA"), which declares that "the

framers of the Constitution[] recogniz[ed] free exercise of religion as an unalienable right" and

severely restricts the federal government's authority to burden sincere exercises of religion. 42 U.S.C. § 2000bb.

3.     Plaintiffs in this action — a New York religious corporation, the Temple of Noya ("Temple"), and several of its officers, spiritual leaders, and members/adherents (known as "*pasajeros*"[1]) — invoke this bedrock principle in its simplest form. They ask this Court to permit them to practice their religion without fear of government persecution, precisely as RFRA requires.

4.     Plaintiffs and the Temple's other community members are sincere participants in a religion rooted in the longstanding spiritual practices taught to the Temple's core members (including its founder and spiritual leader, Plaintiff Maria Ann "Mia" Morgan) by Don Enrique Lopez ("Don Enrique"), a spiritual leader and *maestro* from the indigenous Shipibo tribe in the Amazon River Basin. Plaintiffs believe in a cosmology in which plant spirits are conscious beings, with unique personalities and qualities. By connecting with the living consciousnesses of the plant kingdom, participants receive deep spiritual teachings. These connections also support participants in their personal growth and spiritual healing.

5.     Ms. Morgan has led the Temple in continuing Don Enrique's longstanding, revered rituals, knowledge, and beliefs. Ms. Morgan and the Temple have stayed true to Don Enrique's vision of sharing the healing power of the plant spirits with the world, while working to extend his spiritual tradition safely in the United States with his blessing.

6.     Plaintiffs and other Temple leaders have devoted years of study to their faith — in some cases, over a decade. They have undertaken numerous sacred journeys to Peru, where they have spent weeks or months on end studying, training, and participating in the practice of plant

---

[1] *Pasajero* means "passenger" in Spanish. Plaintiffs refer to those who have sat in ceremony at the Temple, and thereby participated in the Temple's religious practice and joined its religious community, as *pasajeros*.

*dietas* with their teachers.[2] Plaintiffs have made professional and personal sacrifices, forgoing prestigious and lucrative career opportunities, to prioritize their own spiritual empowerment and share the gift of their knowledge and practice with others.

7.    During the Temple's group religious ceremonies, ceremony facilitators and *pasajeros* partake in a sacred medicine called *ayahuasca*, or "the medicine."[3] For Plaintiffs and other *pasajeros* sitting in ceremony, *ayahuasca* is a sacrament, like communion in other religions. In other words, *ayahuasca* is a central part of sitting in ceremony — the core of Plaintiffs' religious practice.

8.    While sitting in ceremony, *pasajeros* experience sacred medicine songs sung by Temple leaders. These sacred songs, called *icaros*, call in the plant spirits and open the *pasajeros* to deeper connections with themselves and with the spirits of the plants. These plant spirits are akin to doctors, gods, and healers. Plaintiffs and other *pasajeros* believe that these connections with themselves and the sacred plant spirits powerfully and effectively facilitate profound spiritual empowerment and healing. In addition, certain *pasajeros* who wish to pursue their practice further participate in a longer, more intensive practice called a *dieta*, which involves fasting and ingesting master plants to deepen one's connections with the plant spirits.

9.    Religious use of *ayahuasca* has gained legal recognition and protection, domestically (including by the U.S. Supreme Court) and internationally. Like practitioners of other religions around the world with related roots, *pasajeros* must commune with this sacred medicine

---

[2] In Plaintiffs' religious practice, *dieta* is the process of establishing a sacred spiritual contract with a master plant spirit. Among other things, the traditional Shipibo *dieta* fast requires eliminating salt, sugar, red meat, pork, and dairy, as well as oily and spicy food. Those observing the *dieta* must also refrain from alcohol, drugs, and sex. *See* Joseph Tafur, M.D., *The Fellowship of the River: A Medical Doctor's Exploration into Traditional Amazonian Plant Medicine* 11 (2017).

[3] "The word *ayahuasca* itself is taken from the Quechua language," an indigenous language originating in Central Peru. Tafur, *supra* note 2, at 9. "*Aya* means death or spirit and *huasca* means vine, the spirit vine." *Id.* Some Plaintiffs and *pasajeros* may also refer to *ayahuasca* as *oni*, a Shipibo term that also means "wisdom."

in ceremonial settings to open their connection to the divine and facilitate a relationship with the master plant spirits. The medicine is expertly prepared by experienced practitioners over the course of multiple days, and Plaintiffs and the Temple's other *pasajeros* partake in it only in ceremonial environments for religious purposes.

10.      *Ayahuasca* is vital to Plaintiffs' religious practice. Without *ayahuasca*, Plaintiffs would be unable to connect directly with the plant spirits that are at the core of their religious exercise. But because the sacred medicine contains small amounts of naturally occurring N,N-dimethyltryptamine ("DMT"), the federal government criminalizes the manufacture, possession, importation, use, and distribution of this indispensable component of Plaintiffs' sincere religious exercise.

11.      Indeed, the government recently arrested, held in jail overnight, prosecuted, and convicted the Temple's founder, Ms. Morgan, in connection with her attempt to bring the sacred medicine back to the Temple from a religious journey to Peru in 2023. Twice, the government has seized *ayahuasca* intended solely for the Temple's religious use. The government has also interrogated former travel companions of Ms. Morgan at the airport, inquiring about their ties to Ms. Morgan. And other *pasajeros* have heard about Ms. Morgan's arrest, prosecution, and conviction, which, on information and belief, have sown fear, causing some Temple community members to refrain from participating in their religious practice.

12.      For these and other reasons, Plaintiffs and other believers in the religious practices of the Temple of Noya are subject to a genuine threat of imminent enforcement and credibly fear that the government will continue to enforce the Controlled Substances Act ("CSA") against them, preventing them from procuring the sacred medicine and significantly interfering with the sincere exercise of their religion by forcing them to practice under threat of criminal sanctions, if at all.

13.     For purposes of RFRA, the government's threat undoubtedly imposes a substantial burden upon Plaintiffs' and other *pasajeros'* religious practice. Yet the government cannot show that this burden is necessary to achieve any compelling governmental interest. The scientific evidence proves that the religious use of *ayahuasca* in ceremony is remarkably safe, and the Temple employs rigorous safety and health measures. Moreover, Plaintiffs' sacred *ayahuasca* has never been diverted for recreational use. Plaintiffs continue to go to extraordinary lengths to secure and track the medicine to prevent such diversion, which would be a sacrilege to them.

14.     Even if the government could establish a plausible interest in restricting the Temple's procurement and use of *ayahuasca*, let alone a compelling one, RFRA places the burden on the government to pursue the least restrictive means of advancing such an interest. The categorical, blanket criminalization of Plaintiffs' religious exercise does not satisfy that demanding standard.

15.     Plaintiffs in this case do not seek redress for (or otherwise challenge) any of the prior injuries that the government inflicted on them. They simply ask this Court to provide them with the protection to which they are entitled under RFRA: the ability, moving forward, to practice their religion without the constant fear that they will be interrogated, arrested, or jailed based on their practice, and without the perpetual fear that the sacred medicine will be taken from them and destroyed. In other words, they ask this Court to ensure that they can continue a sincere religious exercise that has helped them (and a great many others) find profound joy, spiritual healing, transformation, growth, meaning, community, support, and connection.

16.     Because Defendants' application of the CSA to Plaintiffs substantially burdens Plaintiffs' and other *pasajeros'* sincere exercise of religion, while neither serving a compelling governmental interest nor constituting the least restrictive means of achieving any such interest,

Defendants are violating and will continue to violate Plaintiffs' and other *pasajeros*' rights under RFRA until this Court issues declaratory and injunctive relief.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the laws of the United States. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(4) because this action seeks equitable relief under an act of Congress (namely, RFRA) protecting civil rights.

18.     This Court has the authority to grant appropriate relief, including injunctive relief, under 42 U.S.C. § 2000bb-1(c), as well as declaratory relief under 28 U.S.C. §§ 2201 and 2202.

19.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1). All Defendants are officers or employees of the United States sued in their official capacities. In addition, a substantial part of the events or omissions giving rise to the claim will occur in this District, and Plaintiffs Temple of Noya, Maria Ann "Mia" Morgan, and Dr. Alan Hutchins reside in this District.

## THE PARTIES

A.      **Plaintiffs**

20.     The Temple of Noya is a New York religious corporation located in the Catskill Mountains and incorporated in Ulster County. The Temple was first incorporated in July 2015 in Kings County, New York. It is dedicated to supporting the emergence of a more interconnected, loving, and peaceful world through its religious and spiritual practice, which facilitates a direct personal experience of the divine, and of the sacred plant spirits, through serving of the medicine.

21.     The Temple is named after Noya Rao, a sacred tree known as the "Tree of Light" that is a central guiding spirit in Plaintiffs' religious practice. As described in further detail below, this religious practice is rooted in a line of spiritual belief from the Amazon Basin region in Peru that traces back possibly thousands of years as part of the ancestral tradition of Don Enrique, a

spiritual leader from the indigenous Shipibo tribe. As detailed below, believers commune with Noya Rao and other sacred spirits by partaking in the sacred medicine known as *ayahuasca*.

22.     Partaking in *ayahuasca* is the central rite of the Temple's ceremonial practice. In the Temple's theology, *ayahuasca* is itself (or "herself") a sacred being who directly connects believers to Nature's divinity, including the master plant spirit teachers, of which Noya Rao is considered the highest and most enlightened in the Temple's tradition. All Plaintiffs (and many of the Temple's other *pasajeros*) are aware that importation, distribution, possession, and use of *ayahuasca* is proscribed by the CSA, but they have partaken in this spiritual medicine as part of their sincere religious practice. In so doing, they have (absent RFRA relief) violated the CSA, and they intend to continue doing so rather than compromising or terminating their sincerely held beliefs and practices.

23.     The Temple has ministered to thousands of *pasajeros* who have journeyed from around the world to attend its sacred ceremonies. The Temple's community has grown solely through word of mouth. Its doors are open to anyone who feels called to the Temple's spiritual work and practice, so long as an existing community member vouches for their intentions and they satisfy the Temple's intake screening criteria.

24.     Plaintiff Maria Ann "Mia" Morgan is a resident of Ulster County, New York, and the founder and lead *maestra* of the Temple of Noya. She is a Wisdom Carrier within the Noya Rao tradition and was trained as a *curandera* (healer) by indigenous Shipibo *maestros* in Peru. Ms. Morgan also serves as a spiritual leader of the Temple, where *pasajeros* refer to her as "*Kaya*."[4] As a *maestra*, Ms. Morgan leads religious ceremonies to guide people through their experience

---

[4] *Kaya* is a Shipibo term which means "spirit."

with the plant medicine and to invoke the guidance and protections of the sacred plant spirits. Ms. Morgan also serves as a trustee of the Temple.

25.    Ms. Morgan has undergone extensive training in Peru under the instruction of Don Enrique, a Master Teacher/*maestro* in his family's ancestral Noya Rao lineage. Ms. Morgan has studied and practiced with Don Enrique and other keepers of this lineage for over a decade. Don Enrique, in alignment with his spiritual vision, initiated and trained Ms. Morgan in his tradition, with the intent that she would bring the sacred medicine work to her community in the United States. Ms. Morgan created the Temple of Noya (and continued Don Enrique's spiritual teachings, with additions for her own community) with Don Enrique's blessing.

26.    Plaintiff Dr. Alan Hutchins is a resident of Ulster County, New York, and a spiritual leader and Chairman of the Temple of Noya. Dr. Hutchins also oversees the Temple's operations. Since 2017, Dr. Hutchins has regularly traveled to Peru for religious studies with Don Enrique and others.

27.    Dr. Hutchins has been a practicing chiropractor for more than 20 years. Decades ago, he studied comparative religion with the support of grants to research the use of plants by Mayan healers and indigenous shamans in Mexico and Dominica. He was first introduced to the medicine in 2003 when he traveled to Peru and participated in his first Shipibo ceremonies. At that time, he developed a core belief in the healing and spiritual power of *ayahuasca* and recognized the importance of its safe use in ceremonies in the United States.

28.    Dr. Hutchins met Ms. Morgan in 2017. He was deeply inspired by Ms. Morgan's integrity and commitment to her faith, which motivated him to join the Temple and to help her build the community they share today. Dr. Hutchins eventually left his business career to work at

the Temple full-time. Through this work, he and Ms. Morgan became committed life partners and have collaborated to bring their shared vision for the Temple and its community to life.

29.     Plaintiff Michelle Bentsman is a resident of Somerville, Massachusetts, and a trustee, an "angel,"[5] and a *pasajera* of the Temple of Noya. Ms. Bentsman is a Ph.D. Candidate in Comparative Religion with a focus on Jewish, Hindu, and Shipibo song healing at Harvard University. Prior to her Ph.D. studies, she received her Master of Divinity from Harvard Divinity School.

30.     Ms. Bentsman sat in ceremony with the medicine for the first time in 2015 in Peru. She joined the Temple in 2018, after she completed her Master of Divinity. Shortly thereafter, Ms. Bentsman traveled with Ms. Morgan to Peru to initiate her first Noya Rao *dieta* under the tutelage of Don Enrique. Ms. Bentsman continues to return to Peru for religious *dietas* with Shipibo *maestros* on an annual or biannual basis. She also engages in *dietas* from the United States.

31.     Plaintiff Jonathan "Sun" Katayama is a resident of Brooklyn, New York, an "angel," and a *pasajero* of the Temple of Noya. He began sitting in ceremony at the Temple in 2016, and Ms. Morgan has been his primary spiritual guide and teacher ever since. His experiences have led to profound healing, personal growth, and spiritual development, and he has devoted his life to this religious path.

32.     In 2018, Mr. Katayama joined Ms. Morgan and Ms. Bentsman on the same spiritual journey to the Amazon rainforest in Peru, where he received his first Noya Rao *dieta* from Don Enrique. He has also received Noya Rao *dietas* administered by Ms. Morgan at the Temple. Since 2016, Mr. Katayama has participated in over 100 ceremonies at the Temple under the guidance of Ms. Morgan as a *pasajero* and "angel."

---

[5] As discussed below, "angels" are Temple volunteers who assist in the facilitation of ceremonies by ensuring the safety and comfort of *pasajeros*.

B.    **Defendants**

33.    Defendant Merrick Garland is the Attorney General of the United States. He is sued in his official capacity. As the nation's chief law enforcement official, Attorney General Garland is responsible for enforcement of the CSA.

34.    Defendant Alejandro Mayorkas is the Secretary of Homeland Security. He is sued in his official capacity. As the head of the Department of Homeland Security, Secretary Mayorkas has supervisory authority over United States Customs and Border Protection ("CBP") and is responsible for enforcing the CSA in connection with the nation's borders.

35.    Defendant Anne Milgram is the Administrator of the Drug Enforcement Administration ("DEA"). She is sued in her official capacity. As the head of the DEA, Administrator Milgram is also responsible for enforcement of the CSA.

36.    Defendant Troy Miller is a Senior Official performing the duties of the Commissioner of CBP. He is sued in his official capacity. As the official performing the duties of the CBP Commissioner, Senior Official Miller is also responsible for enforcement of the CSA in connection with the nation's borders.

## FACTS

I.    **Federal Law Affords Plaintiffs Very Broad Protection for Their Religious Practice.**

37.    The Religious Freedom Restoration Act establishes "very broad protection for religious liberty," above and beyond the protections of the First Amendment itself. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). The Supreme Court has referred to RFRA as "a kind of super statute." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 682 (2020). Accordingly, the protections of RFRA "appl[y] to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a).

38.     In passing RFRA, Congress prohibited the federal government from "substantially burden[ing] a person's exercise of religion" unless the government can show *both* that "application of the burden to the person . . . is in furtherance of a compelling governmental interest" *and* that the government's action against the person constitutes "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. In other words, once plaintiffs establish a "prima facie" case that their sincere religious exercise is substantially burdened by the government, the government bears the burden of satisfying strict scrutiny, an "exceptionally demanding" requirement, and the single most rigorous standard for judicial review of government action. *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022) (quoting *Hobby Lobby*, 573 U.S. at 728).

39.     This landmark statute indisputably protects against the criminalization of religious rites and sacraments, including under the CSA. In fact, RFRA's enactment constituted a direct rejection of the Supreme Court's decision three years earlier in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).

40.     In *Smith*, the Supreme Court "rejected a challenge to an Oregon statute that denied unemployment benefits to drug users, including Native Americans engaged in the sacramental use of peyote." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 424 (2006) (citing *Smith*, 494 U.S. at 890). The *Smith* Court held that "the Free Exercise Clause . . . does not prohibit governments from burdening religious practices through generally applicable laws," and it rejected the view that judges had to "engage in a case-by-case assessment of the religious burdens imposed by" such laws. *Gonzales*, 546 U.S. at 424 (citing *Smith*, 494 U.S. at 883-90).

41.     The *Smith* decision's sanctioning of governmental penalties for sacramental peyote use provoked immediate and widespread pushback. Three years later, a near-unanimous Congress enacted RFRA in direct response to *Smith*. In doing so, Congress expressly rejected the proposition

that the federal government could substantially burden sincere religious practice through generally applicable laws. *See* 42 U.S.C. §§ 2000bb-1(a), (b) (restricting substantial burdens on religious exercise "even if the burden results from a rule of general applicability" and requiring the federal government to justify "application of [such a] burden to the person" under strict scrutiny).

42.    It is therefore unsurprising that federal courts have applied RFRA's protections to additional religious sacraments with psychoactive properties, including the sacred medicine known as *ayahuasca*. Most notably, in *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, a unanimous Supreme Court affirmed a preliminary injunction preventing the government from enforcing the CSA against a religious sect's importation and use of *ayahuasca* (or "*hoasca*"). 546 U.S. at 423. The Supreme Court, in an opinion by Chief Justice Roberts, held that the government failed to present sufficient or compelling reasons to prohibit the sect's religious use of this sacred medicine. *See id.* A district court reached the same conclusion in *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210 (D. Or. 2009), *vacated on other grounds sub nom. Church of the Holy Light of the Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011), after a full trial on the merits.

43.    Importantly, the unanimous Supreme Court in *Gonzales* also recognized that "RFRA . . . plainly contemplates that *courts* would recognize exceptions" to the CSA — "that is how the law works." 546 U.S. at 434. Indeed, Congress declined to include any administrative exhaustion requirement in RFRA (unlike what RFRA's sister statute, the Religious Land Use and Institutionalized Persons Act of 2000, requires in claims by incarcerated individuals). *See Singh v. Carter*, 168 F. Supp. 3d 216, 226 (D.D.C. 2016); *accord Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012). Thus, although the DEA wrote an informal guidance document in 2009, updated in 2020, that purports to create an administrative process for

seeking religious exemptions to enforcement of the CSA,[6] nothing in RFRA or any other federal statute requires any individual to pursue this non-binding guidance in lieu of (or prior to) seeking judicial relief.[7]

44.    To be clear, Plaintiffs do not here challenge the DEA's guidance. Instead, Plaintiffs challenge only the enforcement of the CSA against their religious practice. However, it bears noting that the DEA has never granted an exemption through its guidance for religious use of *ayahuasca*. Three religious organizations have secured exemptions to the CSA for their religious use of *ayahuasca* — most recently, the Church of the Eagle and the Condor in April 2024[8] — and all three did so by filing RFRA actions in court, which led to injunctive relief or settlements.

45.    In fact, according to a recent report by the U.S. Government Accountability Office ("GAO"), the DEA did not grant a single religious exemption *of any kind* through its guidance from at least fiscal year 2016 through January 2024. Of the 24 petitions for religious exemption submitted pursuant to the DEA's guidance during this period, two were denied, eight were withdrawn, 14 remained pending at the conclusion of the period, and zero were granted.[9] As the GAO found, the DEA often takes several years to process (and ultimately deny) petitions. For

---

[6] *See* DEA, DEA-DC-5, *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act (Revised)* (Nov. 20, 2020), https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-5)(EO-DEA-007)(Version2)RFRA_Guidance_(Final)_11-20-2020.pdf.

[7] Although the Supreme Court recently overruled the doctrine of *Chevron* deference, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), the DEA's construction of RFRA would not have merited deference even when *Chevron* was still in force. Even before *Loper Bright*, an agency received no *Chevron* deference where (as here) it construed a statute that it was not responsible for administering, *see Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 519-20 (2018), particularly where (as here) it also declined to exercise formal rulemaking procedures, *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 230 (2001).

[8] *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Attorneys' Fees, Exhibit A, *The Church of the Eagle and the Condor v. Garland*, No. 22 Civ. 1004 (D. Ariz. filed 6/17/2024), ECF 51-2; Sam Reisman, *Ayahuasca Church Settles Religious Freedom Suit with Feds*, Law360 (Apr. 22, 2024), https://www.law360.com/articles/1828241/ayahuasca-church-settles-religious-freedom-suit-with-feds.

[9] *See* GAO, GAO-24-106630, *Drug Control: DEA Should Improve its Religious Exemptions Petition Process for Psilocybin (Mushrooms) and Other Controlled Substances* 38-42 (May 2024), https://www.gao.gov/assets/gao-24-106630.pdf.

instance, one request for exemption of religious *ayahuasca* use filed in 2016 remained pending *almost eight years later*,[10] while the Eleventh Circuit recently noted that a different request for exemption of religious ayahuasca use languished for three years before the DEA even confirmed receipt (which the DEA did only after the petitioner filed a federal lawsuit).[11]

46.    Throughout these years of delay, the DEA's guidance purports to "[p]rohibit" a petitioner's religious practice "[u]ntil [the agency's] [f]inal [d]etermination."[12] In other words, the DEA's guidance demands that petitioners place their religious practice on pause indefinitely while they await approval of their religious beliefs by a government agency. Such bureaucratic suffocation of religious liberties contravenes the purpose of RFRA, illustrating why Congress declined to require administrative exhaustion and why Plaintiffs seek relief directly from this Court.

**II.    Plaintiffs' Sincere Religious Practice Requires Use of *Ayahuasca* in Ceremony.**

**A.    *Ayahuasca*, the Sacred Medicine**

47.    As the Supreme Court's decision in *Gonzales* reflects, *ayahuasca* is a legitimate and internationally recognized component of religious exercises around the world. For centuries, indigenous populations from Peru, Brazil, Ecuador, Colombia, and other countries along the Amazon River basin have used *ayahuasca* for spiritual and ceremonial purposes. These religions and their offshoots have now spread globally.

48.    Although *ayahuasca* is referred to as "medicine" in Plaintiffs' religious practice and throughout this Complaint, and the spiritual leaders involved in preparing this sacred medicine and ceremonially administering it may be referred to as "healers," these terms are not used in the

---

[10] *See* GAO, *supra* note 9, at 39-40.

[11] *See Soul Quest Church of Mother Earth, Inc. v. Att'y Gen., U.S.*, 92 F.4th 953, 960 & n.14 (11th Cir. 2023).

[12] *See* DEA, *supra* note 6, at 2.

same manner as in many Western cultures. Rather, in the context of *ayahuasca* — and in Plaintiffs' religious worldview and practice — this language refers to *spiritual* healing.[13] Thus, Plaintiffs and other *pasajeros* use the medicine to repair their connections to their souls through ceremonial connections with the plant spirits, not simply to treat physical ailments or the like.

49.     In traditional Amazonian religious and spiritual practice, experienced medicine makers create *ayahuasca* by combining the woody *Banisteriopsis caapi* ("*B. caapi*") vine with a mixture of leaves from either the *Psychotria viridis* ("*P. viridis*" or "*chacruna*") bush or, less frequently, the *Diplopterys cabrerana* ("*D. cabrerana*" or *"challiponga"*) vine. These preparers pound the *B. caapi* vine for hours by hand using mallets. The vine is then boiled for up to 12 hours before being removed, placed into a new pot of water, and boiled again. This process is repeated at least four times, and *chacruna* leaves are added, either towards the end of each cycle or during the final cycle. Finally, the mixture is reduced to a thick liquid or paste and stored. Prior to ceremony, the medicine is ceremonially prepared into a liquid intended for use in ceremony.

50.     Preparation of *ayahuasca* is a time-intensive, rigorous, and structured process; for purposes of Plaintiffs' religious practice, the process takes multiple days. Throughout this process (and after), preparers take great care to protect the medicine from waste or loss. The medicine and its ingredients are considered sacred throughout the entire process, and experienced preparers are careful not to spill or otherwise waste the medicine.

51.     The leaves of the *chacruna* bush contain small amounts of N,N-dimethyltryptamine ("DMT"), which is scheduled as a controlled substance under the CSA. As such, DMT — which

---

[13] "Spiritual healing involves raising your consciousness and changing the way you live." Tafur, *supra* note 2, at 105. In the Temple's religious practice, "medicine" refers to anything that can be used for healing, including spiritual healing, and may refer to plants, songs, prayers, and personal experiences. In addition, for purposes of the Temple's practice, there is no meaningful difference between plant "medicine" and "sacrament," as plant medicines are sacred and address the interconnected realms of physical and spiritual health. The Temple does not claim that *ayahuasca*, even when called "medicine," can cure or treat specific disorders or indications.

is produced naturally and endogenously in humans and other mammals, as well as a vast variety of plants — is considered a substance whose use, manufacture, and sale are prohibited by federal law, save for very limited purposes that do not include Plaintiffs' religious practice.

52.    Importantly, *ayahuasca* is not synonymous with DMT. As noted, it is a sacred medicine, part of a spiritual and ceremonial practice, that *contains* small amounts of naturally occurring DMT. It is not an extraction or synthesis of DMT.

53.    Despite widespread misconceptions, *ayahuasca* is not readily susceptible to recreational use or abuse. Common and expected side effects may include nausea, vomiting, and physical discomfort — strong deterrents to those who are simply seeking a recreational "high." Moreover, and significantly, Plaintiffs' religious practice prohibits the use of recreational drugs in the weeks leading up to ceremony, and discourages their use in *pasajeros*' lives outside of ceremony, because their mind-altering effects would likely interfere with participants' connections with themselves and the plant spirits. Similarly, the use of *ayahuasca* outside of the ceremonial setting is considered sacrilegious in Plaintiffs' tradition.

54.    Nevertheless, because the medicine is a mixture that contains small amounts of naturally occurring DMT, Defendants and the federal government as a whole treat it as a controlled substance; criminalize manufacturing, importing, possessing, using, or distributing the medicine; and punish such conduct with seizures, fines, prosecution, and incarceration.

55.    Defendants' enforcement and the government's outlawing of the sacred medicine lacks a scientific basis. The scientific evidence establishes that the DMT in the *chacruna* plant is not in a form with a high potential for abuse. In addition, credible scientific research has shown that the medicine is safe and does not pose risks to health when partaken within a controlled,

ceremonial environment.[14] Studies similarly indicate that the dosage of *ayahuasca* used in religious ceremonies falls far below dangerous levels.[15]

56.    Given the safety of *ayahuasca* in ceremonial settings and its spiritual significance to many religious communities, a number of other countries have legalized or decriminalized the religious or ritual use of *ayahuasca* to some degree. Defendants, in contrast, treat any and all uses of *ayahuasca*—including religious and ceremonial uses—as criminal violations of the CSA.

**B.    <u>Plaintiffs' Religious Beliefs</u>**

57.    Don Enrique is a Shipibo spiritual guide and Ms. Morgan's mentor. The Noya Rao lineage he carries, which forms the foundation of Plaintiffs' faith practices, centers on a cosmology in which connection with specific plants and their spirits encourages deep spiritual healing and growth. Don Enrique's lineage, as he taught it to Ms. Morgan, instructs that these sacred plant spirits foster and encourage alignment with the consciousness of life.

58.    The mythology of Don Enrique's Noya Rao lineage recounts a time when sacred trees, known as Noya Rao, connected the Heavens and the Earth. This connection empowered and healed all the people. Also known as the "Tree of Light," Noya Rao is considered in this lineage to be the most enlightened living consciousness on the planet. Noya Rao and the sacred medicine, *ayahuasca*, are both understood to be the central master plant teachers.

---

[14] On the components and properties of *ayahuasca*, see, for example, E. Frecska, P. Bokor, & M. Winkelman, *The Therapeutic Potentials of Ayahuasca: Possible Effects against Various Diseases of Civilization*, Front. Pharmacol. (Mar. 2, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4773875/; D. Gonzalez *et al.*, *The Shipibo Ceremonial Use of Ayahuasca to Promote Well-Being: An Observational Study*, Front. Pharmacol. (May 4, 2021), https://www.frontiersin.org/journals/pharmacology/articles/10.3389/fphar.2021.623923/full; International Center for Ethnobotanical Education, Research, and Service (ICEERS), *Executive Summary, Global Consumption of Ayahuasca and Reported Deaths: A Rough Estimate of the Number of People Drinking Ayahuasca Worldwide and an Analysis of Fatalities Reported in the Media* (June 2023).

[15] Animal studies suggest a fatal dosage of DMT would be 20 times that of the standard ritualistic *ayahuasca* practice. *See* R.S. Gable, *Risk Assessment of Ritual Use of Oral Dimethyltryptamine (DMT) and Harmala Alkaloids*, 102 Addiction 24 (2006). Research also shows that neither acute nor long-term administration of *ayahuasca* appears toxic to humans. *See* R. Guimarães dos Santos, *Safety and Side Effects of Ayahuasca in Humans — An Overview Focusing on Developmental Toxicology*, 45 J. Psychoactive Drugs 68 (2013).

59.    Although Noya Rao trees had vanished in the modern era, the tradition of the lineage prophesied that they would return when humanity was ready to listen again to the wisdom of nature. In 2010, Don Enrique received a direct communication from Noya Rao, and he was guided into the Peruvian rainforest, where he found a living, bioluminescent Noya Rao tree.

60.    Although Plaintiffs' own religious practice is rooted in and guided by extensive study and partnership with Don Enrique and his particular lineage, Plaintiffs do not purport to speak for any tribe or any lineage as a whole. Relatedly, although the Temple's faith practice is grounded in these traditional practices — and the Temple's leaders have profound reverence for the customs, rituals, and wisdom imparted by their Shipibo teachers — Temple leaders have, as outlined below, built a deep alliance with Don Enrique, continued the spiritual practices of his lineage, and supplemented them to account for the needs of their community in the United States.

61.    Following the teachings of Don Enrique, Plaintiffs and other *pasajeros* commune for ceremonies in which the *maestra/o* (usually Ms. Morgan) and ceremony leaders sing *icaros* to connect with and call in the plant spirits. These *icaros* are a central component of the Shipibo *ayahuasca* ritual.[16] Plaintiffs and certain other *pasajeros* who seek to deepen their connection to the plants also practice a more advanced process called *dieta*, through which they fast and ingest certain naturally occurring plants (none of which have psychoactive properties aside from the medicine).

62.    As part of both sitting in ceremony and following the advanced path of the *dietas*, Plaintiffs and other *pasajeros* partake in the sacred medicine, *ayahuasca*, to initiate a sacred inner journey to access healing experiences in alignment with the plant spirits and each *pasajero*'s own innate wisdom. In other words, participants in both rituals draw upon the power of *ayahuasca*, a

---

[16] Tafur, *supra* note 2, at 249.

master plant teacher, to bring themselves closer to the divine spirits of other master plant teachers, including Noya Rao, and the ancient wisdom within their own bodies and souls.

63.    *Ayahuasca* is an indispensable part of Plaintiffs' practice, as it opens the door to a profound sense of the divine. Plaintiffs believe that the divine can be accessed through their unconscious minds and bodies, where unrealized parts of them exist beyond their everyday consciousness and awareness.[17] By partaking in the medicine, *pasajeros* experience sensations, heightened intuition, and visions that allow them to connect with themselves and the plant spirits in a unique way that transcends the limiting patterns of their mental, emotional, and physical conditioning.

64.    In addition, through the guidance of Noya Rao, aided by the medicine, Plaintiffs and other *pasajeros* are empowered to commune with the hidden and disowned parts of themselves and participate in a deep reconciliation, strengthening their relationships with these separated parts and weaving them back into the fabric of their consciousnesses. This inner journey, facilitated by the medicine, engenders healing by uniting Plaintiffs' conscious and unconscious parts into a greater system of communication and connectivity. This process, Plaintiffs believe, traces back to ancient times, and it is essential for their individual renewal, the renewal of society, and perhaps even the renewal of the living cosmos itself.

65.    For the purposes of this religious exercise, *ayahuasca* must be prepared ceremonially, as described above. Although the rituals of preparing the *ayahuasca* vary from sect to sect, Plaintiffs' religious practice uses *ayahuasca* prepared in a manner consistent with Don Enrique's ancestral lineage. To practice their religion, Plaintiffs must import at least some of this sacred medicine from Peru, where it is ritually prepared by experienced practitioners and boiled

---

[17] In this context, "unconscious" refers not to losing consciousness, but to mental processes that take place below a person's conscious awareness.

down into a paste. This sacred paste is transported to the United States, mixed with water, and ceremonially boiled into a final preparation on Temple grounds before being served in ceremony.

**C.    History and Structure of the Temple**

66.    Ms. Morgan founded the Temple of Noya on July 31, 2015, in Brooklyn, New York.

67.    Prior to founding the Temple, Ms. Morgan enjoyed a successful career as a fashion stylist in New York City. She achieved significant renown in the fashion styling industry, working with top celebrities around the world, presidents and first ladies, major media publications and television outlets, and iconic fashion and celebrity photographers.

68.    Despite her significant professional success, Ms. Morgan felt spiritually unfulfilled. At the peak of her career as a stylist, she felt compelled to seek a higher purpose. It was this desire for self-discovery that led her to embark upon her spiritual journey.

69.    That journey began in the early 2010s, when Ms. Morgan became acquainted with the traditional spiritual practices of *maestros* from the indigenous Shipibo tribe in the Amazon rainforest. She undertook religious travels to the Peruvian Amazon and began studying with indigenous Wisdom Carriers near Iquitos, Peru.

70.    When Ms. Morgan began participating in ceremonies, she immediately felt a profound spiritual connection with the plant spirits. During one of her visits to Peru, in August 2012, the *maestros* with whom Ms. Morgan sat in ceremony communicated to her that she had a unique gift. They encouraged her to pursue her path with the medicine by participating in plant *dietas*, so as to gain experience with their traditions and deepen her connection with the plant spirits. The *maestros* explained that Ms. Morgan's unique qualities and unusual connection to the plants indicated that she was a potential *curandera* and that the plant spirits were calling her to work with them. Ms. Morgan was invited to return to Peru to initiate her *dietas* and begin further

training so she could one day serve the medicine to others. Ms. Morgan accepted the invitation, and soon after, she returned to Peru to begin her *dietas* and training.

71.    As a result of the Wisdom Carriers' encouragement and her already intense connection with and commitment to this religious practice, Ms. Morgan underwent significant personal sacrifices to devote herself fully to this spiritual path. Despite being at the top of her field, Ms. Morgan chose to scale back her work as a fashion stylist to make more time for her religious training and practice. She spent the next several years applying herself to her studies with the *maestros* and continually deepening her connection to the sacred plant spirits.

72.    During her studies, Ms. Morgan connected with a Shipibo spiritual leader known as Don Enrique Lopez, who became her main teacher and guide. Don Enrique, along with other members of his family and community, transmitted the core knowledge, training, and experience in which the Temple's practice is rooted.

73.    Before he met Ms. Morgan, Don Enrique made the decision, after a profound spiritual vision, to initiate non-Shipibo people into the ancestral lineage he and his family carry. After moving away from the village in which he grew up to educate outside students, Don Enrique had a powerful vision in ceremony in which he was contacted by Noya Rao, who instructed him on how to find the mythological bioluminescent tree. This experience reinforced his life's calling and encouraged him and other members of his family and community to share their wisdom, their traditions, and their connection with Noya Rao with then-outsiders like Ms. Morgan. Accordingly, Ms. Morgan returned to Peru in 2014, where she participated in a 10-week initiation course taught by Don Enrique.

74.    After her initiation and spiritual training, Ms. Morgan returned home to New York and, the following year, formally incorporated the Temple of Noya. The community began with a

small group of fewer than 20 individuals who shared a common spiritual interest in exploring their connection with the plant spirits, but it grew rapidly by word of mouth. All the while, Ms. Morgan continued to devote herself to her spiritual and religious studies, regularly traveling to Peru to fast, study, and train for weeks and months at a time. Other members of the community also traveled to Peru with Ms. Morgan to develop their knowledge.

75.    To accommodate the ever-growing Temple community, Ms. Morgan moved the Temple's physical ceremony location to Croton-on-Hudson in 2015, and later to the Catskill Mountains in July 2019. In 2023, Ms. Morgan, Dr. Hutchins, Ms. Bentsman, and the Temple's other trustees formally re-incorporated the Temple in Ulster County.

**D.    Plaintiffs' Religious Practice**

76.    The Temple of Noya has ministered to thousands of *pasajeros*. As the Temple has grown, Ms. Morgan, Dr. Hutchins, Ms. Bentsman, Mr. Katayama, and other leaders of the Temple community have undertaken spiritual travels to Peru to study and train under Don Enrique and others of his lineage.

77.    The Temple has numerous core staff members and volunteers, including a handful of ceremony leaders, known as *maestros*; multiple assistant ceremony facilitators; a team of "angels," who assist in the facilitation of ceremonies by ensuring the safety and comfort of *pasajeros*; an Intake Manager; a Temple Manager; and volunteers for kitchen and grounds work. The *maestros* and assistants, all vetted by Ms. Morgan, have undergone extensive training under indigenous *maestros* in Peru. In addition, all *maestros* and assistants have undertaken several Noya Rao *dietas*. The Temple provides annual scholarships to all *maestros*, all assistants, and some other Temple leaders/staff to travel to Peru and continue their spiritual training.

78.    The Temple's physical facility, located in the Catskill Mountains of upstate New York, is a holy place that is dedicated solely to the Temple's sacred work. The Temple building

and surrounding grounds are designed specifically to support *pasajeros* in their spiritual process. The grounds also provide a space for *pasajeros* to gather as a community outside of ceremonies. The Temple's grounds include a vegetable garden, a flower garden, walking paths, meditation and contemplation areas, beehives, a pond, and an obelisk park.

79.    A 22-foot granite obelisk (erected to consecrate the Temple on the 4th of July in 2023) symbolizes American independence and the right to freedom of religion. The obelisk is surrounded by a "Flower of Life" pattern and an ouroboros (a serpent eating its tail). Both of these symbolize the Temple's function as a safe and protected place to connect with the divine. The Temple, in other words, is a sacred structure built to contain the spiritual work of the community, as well as cultivate an evolving vision of the Temple as a place of planetary healing that bridges ancient wisdom and our modern culture.

80.    The Temple has hosted several community meditations to anchor the community's intentions into the land and its sacred grid. The sense of peace and safety conferred by the Temple's physical buildings and grounds offer support for *pasajeros*.

81.    Like Don Enrique, Plaintiffs are sincerely inspired to share the spiritual medicine of *ayahuasca* and Noya Rao with others. Thus, the Temple is dedicated to supporting the emergence of a more interconnected, loving, and peaceful world by facilitating direct personal connections with the plant spirits and the divine. To do so, as noted above, Plaintiffs and other *pasajeros* sit in religious ceremonies. In addition, some *pasajeros* who wish to further strengthen their relationships with themselves and with the plant spirits pursue *dietas*.

82.    Individuals interested in joining the Temple community and participating in ceremony can be brought to the Temple only through a personal referral from an existing

community member. This referral requirement helps the Temple continue to grow its membership while also protecting against individuals who might seek the medicine for non-spiritual purposes.

83.    After receiving a referral from an existing community member, the Temple's Intake Manager contacts the potential participant and conducts an in-depth intake process. That process involves a medical screening and a personal interview designed to assess whether participating in the ceremony is appropriate for the potential participant.

84.    The Temple's intake process serves three purposes. *First*, each intake call is an opportunity to orient a potential ceremony participant. Accordingly, during each phone consultation, the Intake Manager goes over any questions the participant may have and helps the individual set expectations for participating in the ceremony.

85.    *Second*, the intake process allows the Temple to screen out individuals who could risk having significant adverse health outcomes from taking the sacred medicine, based on potential interactions with the individual's preexisting conditions or medications. To that end, during each intake call, the Intake Manager asks whether the individual has any prior experience with *ayahuasca* or other plant medicines. The Intake Manager then asks the individual to disclose any preexisting conditions, history of drug or alcohol abuse, and use of certain prescription medications. If the individual's answers indicate a potential risk of serious adverse medical outcomes, the Intake Manager will alert the individual of that risk and prohibit the individual from partaking in the medicine indefinitely — or, at minimum, until the potential risk factor has been resolved. The Intake Manager may also advise individuals to consult with their own physicians to better understand and manage any potential interactions between the medicine and their preexisting conditions or medications.

86. *Third*, the intake process enables the Temple to confirm that the individual seeking to participate in ceremony has a genuine spiritual interest. As noted above, *ayahuasca*'s common side effects, which include nausea, vomiting, and physical discomfort, render recreational use and abuse very rare. Even so, the Temple excludes any individual who may seek to use the medicine for any reasons other than spiritual ones, including through its requirement that any new individual be referred by an existing community member and through its assessment of each individual's intentions during the intake process. Because *ayahuasca* is sacred to the Temple, to disrespect it by misusing it for non-spiritual purposes would, in effect, be sacrilegious. In addition, as noted above, all recreational drugs are strictly prohibited in the weeks leading up to the ceremony.

87. Once a prospective participant clears the intake process, they must complete a more extensive health questionnaire and conduct an additional check-in with the Intake Manager to confirm their up-to-date health status and their intentions prior to participating in ceremony. In addition, before partaking in the medicine as part of the religious observance, all participants have a final check-in with the *maestra/o*.

88. Each ceremony is facilitated by a *maestra/o* and assistants, supported by angels. Ms. Morgan and other Temple leaders have incorporated angels into the Temple's religious practice to help guide *pasajeros* through ceremonies safely. On occasion, *maestros* from Peru and other countries who have trained in the lineage travel to facilitate ceremonies for the community.[18]

89. To open the ceremony itself, the *maestra/o* prays into the medicine using a sacred Noya Rao pipe containing *mapacho*, a South American variety of tobacco. The *maestra/o* then carefully and ritualistically serves participants *ayahuasca*. The *maestra/o* and assistants then lead

---

[18] In each ceremony, several individuals among the Temple staff and volunteers present (the *maestra/o*, the assistants, and the angels) have received Red Cross CPR and first aid/emergency response training.

the *pasajeros* on their journey with the medicine by singing religious songs, or *icaros*, through the night that enable them to connect with the plant spirits (including the sacred Noya Rao tree).

90.     At the end of the ceremony, the *maestra/o* sings a closing *icaro*, which seals the work that has been done and brings protection to the *pasajeros*. At this time, the ceremony leaders check in with each *pasajero* and then "close" each person's experience by anointing them with *mapacho*, Agua de Florida, or rose water. The *maestra/o* leads a gratitude prayer and announces the end of the ceremony.

91.     The morning after the ceremony, *pasajeros* take part in a sharing circle where they reflect on their spiritual journeys and the transformative power of the medicine. The sharing circle typically takes two to four hours. It is a critical part of Plaintiffs' religious practice, as it enables *pasajeros* to integrate, reflect, and learn from one another's experiences. After the ceremony weekend, *pasajeros* may choose to join an additional group sharing/integration video call.

92.     Most *pasajeros* return to the Temple to participate in ceremonies at least once, and many return on a regular basis. Some may feel called upon to pursue their spiritual practice more deeply through *dietas*, while others may find spiritual fulfillment through sitting in ceremonies just once or twice, without ever engaging in a *dieta*. While Plaintiffs are devoted to facilitating *pasajeros*' spiritual healing through their connections with the plant spirits, they do not push *pasajeros* to return to ceremony or to pursue *dietas* at any particular time, and the Temple invites returning *pasajeros* to attend community events without requiring repeat participation in ceremony. Plaintiffs believe that the medicine will call upon each *pasajero* to return if and when it is necessary for their spiritual growth and healing.

93.     The Temple sets a suggested donation amount for participants to help cover the costs of Temple operations. However, the Temple does not shun participants because they are

unable to pay, and it regularly provides the opportunity for people with financial limitations to attend services. Each year, numerous *pasajeros* participate in ceremony without making any donation or while donating less than the suggested amount.

94.    As noted above, diversion of the medicine for non-spiritual uses (including any consumption of the medicine outside of ceremony) is a sacrilege. Accordingly, Plaintiffs take great care to secure the medicine. Unprepared medicine (usually in paste form) is logged, weighed, and stored in a hidden vault protected by a biometric lock and alarm. When a batch of the medicine is prepared for ceremonial use, it is weighed again, logged again, and stored in a second location that is also secured by a biometric lock and alarm. When prepared medicine is taken from this storage location to ceremony, it is again weighed and logged out. After the ceremony, any remaining medicine is weighed and logged yet again. Finally, even during the ceremony itself, *pasajeros* are not permitted to serve themselves the medicine. Only the *maestra/o* is permitted to serve it. No *pasajero* has violated this rule, and the Temple would ban any participant who did so.

95.    Plaintiffs and other Temple leaders are dedicated to the Temple and to their religious practice. Over the years, Plaintiffs have seen thousands of lives changed for the better through their religious practice, profoundly reinforcing their faith. Specifically, through Plaintiffs' spiritual practice, *pasajeros* have found new purpose and direction, overcome serious traumas, and developed a sense of spiritual community that motivates them to contribute more to society. The Temple's community has led to the formation of deep friendships, loving romantic relationships, and even marriages (including two that Ms. Morgan herself has officiated at the Temple). And the Temple's sacred grounds serve as a spiritual home and a source of stability and support for community members.

96.     This joy, spiritual fulfillment, and meaning is at the heart of the Temple community. Plaintiffs and other Temple leaders and *pasajeros* believe that serving the community and communing with the plant spirits through their spiritual practice is the most powerful way they can help people spiritually heal and transform their lives for the better.

97.     Plaintiffs deeply believe that the ancient wisdom and spirits of the Earth are speaking through this sacred medicine to our modern world. They believe that there is a profound need at this time to reconcile our relationship with nature, and that it is imperative for the Temple, for its part, to protect and continue its religious practice for the benefit of humanity and the Earth as a whole.

### III.    Absent Intervention by this Court, Plaintiffs Face Severe, Imminent, and Concrete Injury.

98.     Unless this Court intervenes, Plaintiffs (and all other *pasajeros* of the Temple) will be able to practice their religion only in the shadows, if at all, with the ever-present fear of criminal seizures, arrests, and prosecution by the federal government.

99.     Plaintiffs' procurement, possession, and use of the medicine in their religious and spiritual ceremonies facially violates the CSA, which, as explained, makes it a crime to manufacture, possess, import, use, or distribute any mixtures that contain even trace, naturally occurring amounts of controlled substances such as DMT. To practice their religion, Plaintiffs have violated and intend to continue to facially violate the provisions of the CSA with respect to the importation, distribution, possession, and partaking in *ayahuasca* for religious purposes. Because the CSA clearly applies to (and, absent RFRA, criminalizes) Plaintiffs' religious practice, a credible threat of enforcement is presumed, and Plaintiffs need not plead or prove any additional indicia of the likelihood of future prosecution.

100.    In any event, such indicia are overwhelmingly present here. Across the nation, the federal government (sometimes in partnership with state and local law enforcement) has undertaken criminal investigations and initiated prosecutions and other enforcement actions, such as interdictions of *ayahuasca* shipments that were intended for religious use. On information and belief, over the past two decades, the government has pursued a number of such enforcement actions. *See, e.g.*, *Gonzales*; *Church of the Holy Light of the Queen*; *Church of the Eagle and the Condor*.

101.    If any doubt remains, Plaintiffs' and other Temple *pasajeros*' own experiences eliminates it. In January 2023, the government seized a suitcase owned by a Temple leader at John F. Kennedy Airport ("JFK Airport") containing the medicine (in paste form) that was intended for religious use by the Temple and its *pasajeros*. Two months later, in March 2023, Ms. Morgan herself was arrested at JFK Airport for carrying the medicine in her own suitcase as she returned from religious travel to Peru. Again, Ms. Morgan was carrying the medicine (in paste form) solely for religious use by the Temple and its *pasajeros*.

102.    Ms. Morgan was charged by complaint with a felony for knowingly and intentionally importing one or more controlled substances into the United States. *See* 21 U.S.C. §§ 952(a), 960.[19] She spent a night in jail before being arraigned and released on bond. At the time, Ms. Morgan had just concluded a *dieta* observance, and she was endeavoring to follow post-*dieta* guidelines for spiritual integration designed to minimize stress and stimulation. Being arrested and

---

[19] In addition to being charged with importing DMT, the felony complaint initially accused Ms. Morgan of separately importing LSD within dietary capsules, based on a purported field test result. That accusation was demonstrably false. Ms. Morgan explained that she would never possess or import LSD in any form because, as noted above, recreational drug use is against her religious beliefs. Ms. Morgan was vindicated when a lab test ruled out the presence of LSD and the government abandoned any possible charges on that front.

thrown in jail profoundly violated those guidelines. In addition, the government seized the sacred medicine from Ms. Morgan's suitcase.

103.    Ultimately, Ms. Morgan resolved her federal criminal prosecution through a guilty plea to misbranding pursuant to the Food, Drug, and Cosmetic Act, a misdemeanor. *See* 21 U.S.C. §§ 331(a), 333(a)(1). She was sentenced to three months' probation and a $5,000 fine, which she has now completed and paid.

104.    The ordeal of being arrested on charges of violating the CSA (which carries penalties of up to twenty years in prison), jailed, and criminally prosecuted imposed a severe emotional, spiritual, and financial toll on Ms. Morgan. For the first time in her life, she now has a criminal record, which she never would have had but for her religious practice.[20]

105.    On information and belief, federal law enforcement officials also have questioned certain individuals at JFK Airport about their affiliations with Ms. Morgan. Moreover, the news of Ms. Morgan's arrest and prosecution has spread among some of the Temple's community members. On information and belief, Ms. Morgan's arrest and prosecution have provoked fear among some *pasajeros*, leading some to limit their participation in their religious exercise or even halt it entirely (*e.g.*, by deciding not to sit in ceremony due to the fear that they, too, could be arrested or prosecuted).

106.    In addition, because of Ms. Morgan's ordeal, Temple leaders rightfully understand that if they were to bring *ayahuasca* from Peru to the United States, no matter how it is labeled or whether it is declared, federal agents would seize the sacred medicine, and that they would face a

---

[20] Neither Ms. Morgan nor any other Plaintiff in any way challenges Ms. Morgan's plea, conviction, or sentence, nor the forfeiture of the Temple's sacred medicine in connection with her arrest. Plaintiffs discuss these agonizing events solely to illustrate the credible, concrete, and imminent threat of prosecution all Plaintiffs face absent judicial intervention. To that end, no Plaintiff seeks retrospective relief, such as damages; Plaintiffs seek only prospective relief against future CSA enforcement, which would violate their rights under RFRA.

significant risk of criminal prosecution. As a result, Plaintiffs and other Temple leaders currently lack any reliable method of procuring the sacred medicine from Peru, as is necessary for their religious practice.

107.    Although Plaintiffs have procured the medicine domestically, this has proven insufficient on its own. Domestically sourced *ayahuasca*, even when prepared ceremonially by an individual adhering to the rituals of Don Enrique's lineage, lacks the direct link to the land and the spiritual energetic signature of medicine sourced and prepared in Peru. This impedes Plaintiffs' and Temple *pasajeros*' ability to fully connect with the source of their tradition and the native plant spirits. Accordingly, when Plaintiffs have used domestically sourced *ayahuasca* in their practice, they have done so only by mixing it with stores of the medicine from Peru. In all events, because the government treats *ayahuasca* as a Schedule I controlled substance no matter where it originated, even procuring it domestically violates the CSA, which makes it unlawful to manufacture, import, possess, use, or distribute such substances.

108.    Plaintiffs' inability to procure, import, possess, or use *ayahuasca* has required them to ration the Temple's existing supply of the medicine and jeopardizes their religious practice entirely.

**IV.    Defendants' Criminalization of Plaintiffs' Sincere Religious Practice Violates RFRA.**

109.    Defendants' criminalization of Plaintiffs' religious practice violates Plaintiffs' established rights under RFRA.

110.    As explained above, Plaintiffs and other *pasajeros* have devoted themselves to their religious practice through years of collective study, making significant personal sacrifices along the way. They have done so because they believe, deeply and sincerely, in the plant spirits and the spiritual power of the medicine. Their religious practice enables them and their fellow believers to

connect with the intelligence of nature, within both themselves and the master plants, to bring about profound spiritual insight, healing, and transformation.

111.    By enforcing the CSA against Plaintiffs, Defendants have placed and will continue to place Plaintiffs in an untenable position. Plaintiffs and the Temple's *pasajeros* face the Hobson's choice of continuing their religious practice in the shadows, thereby facing serious law enforcement consequences (including seizures of the sacred medicine, arrests, incarceration, and criminal prosecutions), or abandoning the sincerely held religious beliefs and practices to which they have committed themselves. It is difficult to imagine a more substantial burden on religious exercise.

112.    The Temple sues in its own right, given the substantial burden Defendants have placed and continue to place on the Temple's own religious practice, as well as on behalf of its *pasajeros*, each of whom faces an equivalent (and equivalently substantial) burden on their own sincere religious exercise.

113.    The Temple has standing to sue on behalf of its *pasajeros*, *i.e.*, its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Because all Temple *pasajeros* are suffering injury as a result of a credible threat that Defendants will enforce the CSA against their sincere religious practice, they each have standing to sue. The interest the Temple seeks to protect — its *pasajeros*' free religious exercise — is not merely germane to the Temple's purpose; it is the reason for the Temple's existence as a religious corporation. Finally, because Defendants interpret the CSA to uniformly ban *ayahuasca*, the sacred medicine that lies at the core of each Temple adherent's religious practice, neither the RFRA claim the Temple asserts, nor the declaratory and injunctive relief it seeks, requires the participation of each injured adherent.

114.    Under RFRA's demanding strict scrutiny standard, Defendants cannot justify the substantial burden they have imposed and are continuing to impose on Plaintiffs' and other *pasajeros*' sincere religious practice. The government lacks a compelling interest in enforcing the CSA against Plaintiffs' and other *pasajeros*' use of *ayahuasca*, given Plaintiffs' extensive health, safety, and anti-diversion precautions (which have succeeded for nearly a decade, across thousands of ceremony participants), and in light of the substantial scientific evidence that *ayahuasca* can be used safely in controlled, ceremonial settings for religious purposes.

115.    Outright criminalization of Plaintiffs' and other *pasajeros*' religious practice plainly would not constitute the least restrictive means for the government to achieve any compelling interest. To the contrary, outlawing private religious practice under threat of criminal sanctions, up to and including incarceration, is the *most* restrictive weapon in any government's arsenal.

116.    Absent intervention by this Court, Plaintiffs' and other *pasajeros*' sincere religious practice will continue to be substantially burdened — indeed, outlawed — in direct contravention of RFRA, a statute Congress enacted precisely to protect such religious exercise against government intrusion.

## CAUSE OF ACTION

**Count I: Violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.***

117.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

118.    The omnipresent threat that Defendants will enforce the CSA against Plaintiffs and other *pasajeros* by seizing their *ayahuasca*, arresting Plaintiffs and other *pasajeros*, and criminally prosecuting Plaintiffs and other *pasajeros* imposes a substantial burden on Plaintiffs' and other

*pasajeros*' sincere religious practice and beliefs. Were this threat to be realized, as it has been in the recent past, Plaintiffs' sincere religious practice and beliefs would be further burdened.

119.    Enforcement of the CSA, a federal criminal statute, against Plaintiffs and other *pasajeros* for their religious practice serves no compelling governmental interest. Nor is it the least restrictive means of advancing any governmental interest.

120.    Defendants' threat of CSA enforcement against Plaintiffs and other *pasajeros* violates, and Defendants' imminent enforcement efforts against Plaintiffs and other *pasajeros* continue to violate, Plaintiffs' and other *pasajeros*' rights under RFRA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

i.    A declaratory judgment that Defendants' enforcement of the CSA against Plaintiffs and other *pasajeros* for their religious procurement, importation, possession, and use of *ayahuasca* — whether through arrest, criminal prosecution, incarceration, seizure of Plaintiffs' *ayahuasca* that is intended for religious use by the Temple and its *pasajeros*, or other enforcement actions — violates RFRA.

ii.    An injunction prohibiting Defendants from enforcing the CSA against Plaintiffs' and other *pasajeros*' sincere religious exercise, including (A) Plaintiffs' and other Temple leaders' procurement, importation, serving, possession, and/or use of *ayahuasca* for/within ceremonies and *dietas*, and (B) *pasajeros*' possession and use of *ayahuasca* within ceremonies and *dietas*.

iii.    An order awarding Plaintiffs attorneys' fees under 42 U.S.C. § 1988(b) and attorneys' fees, costs, and expenses pursuant to 28 U.S.C. § 2412.

iv.    Such other and further relief as the Court deems just and proper.

Dated: September 30, 2024
New York, New York

Sean Hecker
David Gopstein
Trevor Morrison*
Amit Jain
Alisha Bruce
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
shecker@heckerfink.com
dgopstein@heckerfink.com
tmorrison@heckerfink.com
ajain@heckerfink.com
abruce@heckerfink.com

Gilbert Paul Carrasco*
California Bar No. 90838
D.C. Bar No. 334722
900 Pacific Coast Highway, Suite # 305
Huntington Beach, California 92648-4863
(503) 990-4879 (mobile)
carrasco@willamette.edu
*pro hac vice application forthcoming*

*Attorneys for Plaintiffs*